UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OVE WILLIAM AKERBLOM, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:11-cv-694 |
| | § | |
| EZRA HOLDINGS LIMITED, *et al*, | § | |
| | § | |
| Defendants. | § | |

**<u>MEMORANDUM & ORDER</u>**

Pending before the Court is Plaintiff Ove William Akerblom's ("Plaintiff" or "Akerblom") Motion to Remand. (Doc. No. 12.) Having considered the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Akerblom's Motion to Remand should be **DENIED**.

**I.     BACKGROUND**

Akerblom, a Texas citizen, sued Defendants Ezra Holdings Limited ("Ezra"), Ezra Energy Services Pte. Ltd. ("EES"), Emas Offshore Limited ("EOL"), Emas Subsea Services, LLC ("Emas Subsea"), and Lee Chye Tek Lionel Lee a/k/a Lionel Lee ("Lee") (collectively, "Defendants") in Texas state court for breach of contract, common law fraud, statutory fraud, breach of fiduciary duties, intentional infliction of emotional distress, intentional interference with existing contracts, and civil conspiracy. Defendants timely removed the case, invoking the federal court's diversity jurisdiction. (Doc. No. 1.) In their notice of removal, Defendants contend that the amount in controversy exceeds $75,000 and that Defendants Ezra, EES, EOL, and Lee are citizens of Singapore and/or the United Kingdom. Defendants concede that Defendant Emas Subsea is a citizen of

1

Texas, and therefore, not diverse from Akerblom, but argue that its citizenship should be disregarded because it was improperly joined in this action.  Indeed, Defendants maintain that, based on the allegations contained in Akerblom's Original Petition, there is no reasonable basis for the Court to predict that Akerblom might be able to recover against Emas Subsea in state court.

Akerblom timely filed the instant Motion to Remand, along with his First Amended Complaint.  Akerblom does not dispute that the amount in controversy exceeds the jurisdictional amount, but argues that the Court lacks diversity jurisdiction because valid claims exist against non-diverse Defendant Emas Subsea.

### A.  Allegations in Original Petition

In his Original Petition, Akerblom alleges that Ezra approached him with an oral offer to purchase Intrepid Global Pte. Ltd. ("IGPL"), a company in which, at the time, Akerblom held majority ownership.  (Original Pet. ¶ 19.)  For several months thereafter, Akerblom alleges, communications took place between Akerblom and Lee, managing director of Ezra, regarding Ezra's potential purchase of IGPL.  (*Id*.)  Akerblom claims that he rejected Ezra's initial written offer to purchase IGPL due to Akerblom's concerns over the transfer of Ezra, his employment agreement, and Ezra's infusion of cash into IGPL.  (*Id*.)  According to Akerblom, following his rejection of Ezra's initial offer, Lee and the chief financial officer of Ezra met with Akerblom in an effort to induce him to sell his interest in IGPL and become part of Ezra.  (*Id*.)  Akerblom alleges that, among other statements, Lee represented to him the following in connection with the potential purchase of IGPL:

    a.    Ezra would transfer 1,500,000 shares of Ezra to Akerblom, which would vest over a four (4) year period;

    b.        Akerblom would be provided with a five (5) year employment contract with Ezra and Emas Subsea;

    c.        Akerblom would retain ten percent (10%) ownership of IGPL, and Emas Subsea would be integrated with IGPL;

    d.        Ezra would inject significant cash flow and support into IGPL;

    e.        Lee would ensure that IGPL's staff was paid every month;

    f.        Yearly revenue of the Emas Subsea group was initially calculated to be $172,000,000 within a few years; and,

    g.        Akerblom's 10% retention of IGPL stock would generate approximately $22 million in annual profit to Akerblom over a five year period. (*Id*.)

Subsequently, Akerblom alleges that he and Ezra entered into a series of agreements in which Akerblom agreed to transfer 90% of the outstanding shares of IGPL to Ezra. Akerblom also entered into a five-year service agreement with IGPL under the terms of which Akerblom was to be appointed managing director of IGPL and receive a monthly salary of approximately $35,000. (*Id*. ¶ 21.) In the absence of Lee's representations on behalf of Ezra, Akerblom alleges, he would not have entered into the agreement to sell his IGPL stock or the service agreement providing for his employment with IGPL. (*Id*.) Following the execution of these agreements, Akerblom alleges that he was introduced to Greg McCavanagh, associate director of Emas Subsea and advised that McCavanagh would report directly to Akerblom. (*Id*. ¶ 22.) At a meeting held sometime thereafter, Akerblom alleges that an organizational chart confirmed that he was to be in charge of Emas Subsea on a global basis. (*Id*.)

Akerblom contends that, in the first eight months after Akerblom signed the two agreements with Ezra, he and the employees of IGPL provided significant support to Ezra's various programs. (*Id*. ¶ 23.) Additionally, Akerblom asserts, he and IGPL

presented a number of business opportunities to Ezra, which Lee unilaterally decided to forego. (*Id*.) In addition, rather than allow IGPL to assist Ezra in Nigeria, as IGPL had proposed, Akerblom alleges that Ezra took IGPL employees and moved them into a different Ezra subsidiary. (*Id*.) Akerblom claims that these actions caused both financial and reputational damage to IGPL. (*Id*.)

At sometime thereafter, Akerblom alleges, Ezra established Emas Subsea Pte. Ltd. ("ESPL") and began hiring personnel for the newly formed entity. (*Id*. ¶ 25.) According to Akerblom, Ezra then began shifting business from IGPL to ESPL, despite Lee's representations that Akerblom would be in charge of all Subsea services for Ezra. (*Id*.) At a group manager meeting shortly after the new entity's formation, Akerblom alleges that Lee indicated that Akerblom would be placed in charge of Ezra's overall marine construction business. (*Id*.) On the second day of the same meeting, however, Akerblom was advised that plans had changed and that he would be in charge of operations only. (*Id*.) Akerblom alleges that, when he refused to accept this change in duties, Lee began to express dissatisfaction with Akerblom and falsely accused him of not delivering projects. (*Id*.)

Following the group manager meeting, and over the next several months, Akerblom alleges that various discussions took place regarding the possibility of Akerblom repurchasing the shares of IGPL that he transferred to Ezra under the agreement. (*Id*.) Akerblom contends that Lee advanced a proposal wherein Ezra would transfer the IGPL shares back to Akerblom in exchange for Akerblom returning the 1,500,000 shares of Ezra stock he received and paying Ezra $650,000. (*Id*.) Akerblom asserts that Lee told him to accept the deal or Lee would see to it that Akerblom was

4

ruined economically and forced into personal bankruptcy. (*Id.*) Akerblom claims that Lee suggested that any legal process would be useless and that Lee and Ezra would ruin Akerblom. (*Id.*)

Several days later, according to Akerblom, Lee notified him that IGPL was no longer a part of Ezra, Ezra would no longer provide payroll to IGPL employees, and that all computers, passes, etc. of IGPL employees were to be returned to Ezra immediately. (*Id.* ¶ 26.) All IGPL employees were allegedly ordered to leave the building at once. (*Id.*) Contemporaneously, Akerblom contends, Lee began to interfere with another company in which Akerblom holds an interest, Intrepid Offshore Contractors ("IOC"). (*Id.* ¶ 27) Specifically, Akerblom alleges, Lee instructed other Ezra personnel to force one of the owners of IOC to terminate a team of eleven employees, including Akerblom, and induced another Ezra entity, Ezra Marine Services Pte. Ltd., to cancel an existing contract with IOC. (*Id.*)

Akerblom alleges that, by virtue of his position as an officer, director and/or fiduciary of IGPL, Lee owed fiduciary duties to IGPL and its shareholders, a number of which duties Akerblom alleges Lee violated. (*Id.* ¶ 30-34.) Lee's actions, Akerblom contends, have irreparably damaged IGPL's corporate image and goodwill. (*Id.* ¶ 35.)

### B. Additional Allegations in First Amended Complaint

Akerblom's First Amended Complaint reiterates the allegations contained in the Original Petition and provides further detail regarding the nature of Ezra's business and the relationship among the various entities named as defendants in both pleadings.[1] Specifically, Akerblom alleges that Ezra was founded in 1992 and is an offshore support

---

[1] Akerblom also provides new facts in his First Amended Complaint related to additional actions or statements made by Lee and/or Ezra; however, the Court will only review the new allegations that are arguably relevant to the present Motion to Remand.

5

and marine services company that operates globally under the Emas brand name. (Am. Compl. ¶ 18.) According to Akerblom, Ezra operates through twenty-four (24) divisions categorized by subsidiaries, which, in turn, are divided into another thirty-six (36) subsidiaries. (*Id*.) Akerblom alleges that Ezra maintains central accounting, human resources, and legal functions for each of its divisions. (*Id*.)

Akerblom also maintains that Ezra re-established operations in Houston, Texas, and established Emas Subsea as a Texas corporation during the negotiations regarding Ezra's potential acquisition of IGPL. (*Id*. ¶ 19.) Akerblom explains that Ezra's main approach to business development was to use Houston as the key point of client interface and to set up satellite operations on a project basis. (*Id*. ¶ 22.) Consistent with this business development plan, Akerblom alleges, Lee announced that he would be moving to Houston to oversee the startup of the company's Subsea business, which was to be integrated into the IPGL business. (*Id*.) Akerblom also contends that, shortly after he signed the agreements with Ezra, the Emas Group announced in its publication called "The Connection" that Akerblom was the managing director of Emas Subsea and Intrepid Global, and Greg McCavanagh was overseeing the Houston office and its involvement in the Subsea sector. (*Id*. at 23.)

In addition, Akerblom alleges, for the first time in his First Amendment Complaint that Ezra, EES, EOL, Emas Subsea, and IGPL operated as a joint enterprise under the name of EMAS or Emas Group in connection with the conduct complained of. (*Id*. ¶ 38.) Akerblom contends that the entities agreed to a common purpose of inducing him to sell a majority interest in IGPL, had a community of pecuniary interest in the acquisition of IGPL, and had an equal right of control. (*Id*. ¶ 51.) According to

6

Akerblom, Lee is either the managing director of each entity or division, or is in control of it and the group. (*Id.* ¶ 38.) Akerblom claims that it is often impossible to determine for which entity Lee is acting, as he is acting on behalf of Ezra and EMAS in all that he does. (*Id.*) Because Lee had effective control of the day-to-day operations of each entity, Akerblom contends, Lee manipulated the companies to obtain a benefit for each division. (*Id.* ¶ 51.)

Akerblom also asserts that, EES, EOL, Emas Subsea, and IGPL are the alter ego of Ezra. (*Id.*) He maintains that EES, EOS, and Emas Subsea were organized and operated as a mere tool or business conduit of Ezra in that there was and is unity between EES, EOS, and Ezra, and any separateness of the entities from Ezra and one another has ceased. (*Id.* ¶ 53.) Finally, Akerblom alleges, Ezra caused EES, EOS, and Emas Subsea to be used for the purpose of perpetuating the fraudulent activities set forth above for the benefit of Ezra. (*Id.*)

## II.   LEGAL STANDARD

The removal statute, 28 U.S.C. § 1441(a), provides:

> [A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

Federal courts have original jurisdiction over any civil action "where the matter in controversy exceeds . . . $75,000 . . . and is between citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). The party that seeks removal has the burden of establishing that federal jurisdiction exists and that removal was proper. *Manguno v. Prudential Property & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). Courts must strictly construe removal statutes in favor of remand and against removal.

*Bosky v. Kroger Tex., L.P*., 288 F.3d 208, 211 (5th Cir. 2002).

Under the fraudulent joinder doctrine, "federal removal jurisdiction premised on diversity cannot be defeated by the presence of an improperly joined non-diverse and/or in-state defendant." *Salazar v. Allstate Texas Lloyd's, Inc*., 455 F.3d 571, 574 (5th Cir. 2006). To establish fraudulent joinder, the removing party must prove either that there has been actual fraud in the pleading of jurisdictional facts, or that there is no reasonable possibility that the plaintiff will be able to establish a cause of action against that party in state court. *Smallwood v. Ill. Cent. R.R. Co*., 385 F.3d 568, 573 (5th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 992 (2005). The defendant must demonstrate that there is no possibility of recovery by the plaintiff against the non-diverse defendant, that is, that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against the non-diverse defendant. *Id*. at 573 (citations omitted). A "mere theoretical possibility of recovery under local law" is insufficient to preclude a finding of improper joinder. *Badon v. RJR Nabisco, Inc.*, 236 F.3d 282, 286 n.4 (5th Cir. 2000). A court may resolve this issue in one of two ways: by conducting a Rule 12(b)(6)-type analysis, looking at the allegations of the complaint to determine whether it states a claim under state law against the non-diverse defendant, or by piercing the pleadings and conducting a summary judgment-type inquiry. *Id.* Ordinarily, if a plaintiff can survive a 12(b)(6)-type challenge, there is no improper joinder. *Id*.

District courts examine the plaintiff's state court pleadings at the time of removal to determine whether there is a reasonable possibility that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state court. *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 259 n. 8, 264 (5th Cir. 1995). Thus,

generally, a "plaintiff cannot defeat removal by amending" his complaint after removal. *Id*. at 265. The Fifth Circuit has reasoned that "[l]imiting the removal jurisdiction question to the claims in the state court complaint avoids" having to revisit the issue every time a plaintiff seeks to amend the complaint to assert a new cause of action against the non-diverse defendant "and permits early resolution of which court has jurisdiction, so that the parties and the court can proceed with, and expeditiously conclude, the litigation." *Id*. at 264. Accordingly, "[p]ost-removal filings may not be considered . . . when or to the extent that they present new causes of action or theories not raised in the controlling petition filed in state court." *Griggs v. State Farm Lloyds*, 181 F.3d 694, 700 (5th Cir. 1999). Similarly, affidavits and other post-removal filings are relevant to the removal inquiry "only to the extent that the factual allegations . . . clarify or amplify the claims actually alleged." *Id*. at 700.

In sum, to defeat Akerblom's Motion for Remand, Defendants must show that this case was properly removed to this Court under 28 U.S.C. § 1441. In order to do so, Defendants must demonstrate that there is no reasonable basis for the Court to predict that Akerblom might be able to recover against Emas Subsea based on the claims and theories Akerblom asserted in his Original Petition.

### III. ANALYSIS

Defendants argue that many of the allegations Akerblom sets forth for the first time in his First Amended Complaint and attached affidavit "go beyond mere clarification or amplification of the facts alleged in his Original Petition." (Def.'s Resp. at 3.) Specifically, Defendants argue that Akerblom's First Amended Complaint raises new theories of recovery not present in his Original Petition. In accordance with the rule

9

advanced in *Cavallini* and *Griggs*, Defendants maintain, the Court should not take into account any theories asserted for the first time post-removal when determining whether there is a reasonable possibility that Akerblom might recover against Emas Subsea in state court.

In support of their position, Defendants cite *Wilken Partners, L.P. v. Champps Operating Corp.* No. SA-10-CV562-XR, 2010 WL 3504057, at *4-5 (W.D. Tex. Sept. 1, 2010). In that case, the district court considered whether the plaintiff's post-removal assertion of single business enterprise liability as a possible theory of recovery against the non-diverse defendant could be taken into consideration in assessing whether that defendant was improperly joined. *Id*. After determining that the relevant state court petition did not allege any claims based on single business enterprise liability, the court concluded that, "[t]hough single business enterprise is not a cause of action but a theory of recovery, post-removal filings may not be considered if they present new theories of recovery not raised in the state court petition." *Id*. at *5. As such, the court held that theories of derivative liability raised for the first time post-removal fall within the scope of "new causes of action or theories" that are not taken into account when considering whether removal was proper. *Id*.

Defendants' position also finds support in the Fifth Circuit. In an unpublished opinion, *De La Hoya v. Coldwell Banker Mexico, Inc.*, the Fifth Circuit noted that it "consider[s] only whether plaintiffs can establish the theories of liability *that they pleaded in the state court complaint*" when determining whether there is a reasonable possibility that the plaintiff might recover against the non-diverse defendant in state court. 125 Fed.Appx. 533, 536 n.2 (5th Cir. 2005) (emphasis added). The Court made

clear, however, that plaintiffs need not necessarily plead a theory of liability by name in order to successfully invoke it for purposes of the improper joinder analysis.  Indeed, in *De La Hoya*, the defendants argued that the plaintiffs did not plead single business enterprise liability in their complaint and, thus, could not rely on it to defeat removal.  Although the Court conceded that the plaintiffs did not *expressly* plead the theory in their complaint, it held that the Court "must determine whether what plaintiffs *did* plead was sufficient to allege single business enterprise" under Texas' liberal notice pleading standard.  *Id*. at 537.  After analyzing the plaintiffs' allegations, the Court stated, "While not a model of clarity, we find that, given liberal pleading standards and resolving all ambiguities in Texas law in plaintiffs' favor, defendants could ascertain" that plaintiffs intended to "pursue available theories of corporate liability, including single business enterprise."  *Id*. at 537-538.  Having found that the plaintiffs adequately pled the single business enterprise theory, the Court continued its analysis to determine whether there was a reasonable basis on which it could predict the plaintiffs' possible recovery against the non-diverse defendants under that theory.

Akerblom concedes that he raised the theories of joint enterprise liability and alter ego for the first time in his First Amended Complaint.  (*See* Mot. at ¶ 13.)  Indeed, he does not even attempt to argue that, despite his failure to plead the theories specifically, his Original Petition contained facts sufficient to put Defendants on notice that he intended to pursue them.[2]  Rather, Akerblom argues that the Court may consider these new theories in determining whether Emas Subsea was improperly joined because they

---

[2] In his Motion to Remand, Akerblom does not attempt to argue that allegations against Emas Subsea in his Original Petition are sufficient to hold the entity *directly* liable for any of the causes of action raised therein.

11

are not separate causes of action, but rather, means of imposing liability against one defendant for a cause of action proven against another. (*Id.*)

To bolster this position, Akerblom has cited authority that joint enterprise and alter ego liability are not causes of action but, rather, "means of imposing liability on an underlying cause of action such as a tort or breach of contract." *Gallagher v. McClure Bintliff*, 740 S.W.2d 118, 119 (Tex. App.–Austin, 1987, writ denied) (citing *Gulf Reduction Corp. v. Boyles Galvanizing and Pl. Co.*, 456 S.W.2d 476 (Tex. Civ. App. 1970, no writ)). Although the Court agrees with Akerblom that the new allegations are not causes of action, the Fifth Circuit has clearly held that "[p]ost-removal filings may not be considered . . . when or to the extent that they present new causes of action *or theories* not raised in the controlling petition filed in state court." *Griggs*, 181 F.3d at 700 (emphasis added). Akerblom has presented no authority for the proposition that joint enterprise and alter ego liability are not "theories" within the meaning of *Griggs*. On the other hand, Defendants have cited cases in the Fifth Circuit that treat legal theories analogous to the joint enterprise and alter ego theories of liability as falling within the class of "theories" that, when raised for the first time post-removal, cannot be considered in determining whether the case should be remanded. The Court is convinced by these cases that theories of derivative liability, such as joint enterprise and alter ego liability, should not be considered in ruling on a motion to remand if they were not raised in the controlling petition filed in state court.

Thus, if Akerblom pled these theories only after the case was removed, the Court will not consider them in determining whether Akerblom has a reasonable possibility of recovery against Emas Subsea in state court. Although Akerblom did not expressly plead

these theories, the Court will consider whether what he *did* plead is sufficient to raise joint enterprise and/or alter ego theory under Texas' liberal notice pleading standard. If Akerblom sufficiently pled these theories in his Original Petition, the Court may consider the theories, including the additional facts Akerblom included in his First Amended Complaint that clarify and/or amplify the theories, in deciding whether there is a reasonable possibility that he could recover against Emas Subsea. The Court will also consider whether Akerblom's pleadings include facts sufficient to show that Akerblom has a reasonable possibility of recovering against Emas Subsea *directly*. Of course, even if the Court does not consider Akerblom's theories of derivative liability, if there is a reasonable possibility that Akerblom will be able to establish a cause of action against Emas Subsea directly in state court, the motion to remand should be denied.

As Defendants point out, although Akerblom sued Emas Subsea, along with four other defendants in his Original Petition, he provided no facts regarding the actions of Emas Subsea or its relationship with Ezra or Lee that would put Emas Subsea on notice regarding the nature of the claims against it. For example, Plaintiff's factual allegations refer to "the Emas Subsea division of Emas Offshore," "the new Emas Subsea group (IGPL)," or simply "Emas Subsea." None of these allegations ascribes conduct to Emas Subsea Services, LLC specifically, but instead, they either generally reference Emas Offshore's business, or distinct and separate entities, such as Emas Subsea Pte. Ltd. Indeed, Akerblom does not allege a single misrepresentation attributable to *Emas Subsea* or an individual acting on behalf of the entity, nor does he allege that Emas Subsea was a party to any of the contracts at issue in the Original Petition. As Akerblom failed to state any specific actionable conduct on Emas Subseas' part in his Original Petition, the Court

cannot say that he has a reasonable possibility of recovering against the entity directly. *See Griggs*, 181 F.3d at 699 ("We cannot say that [Plaintiff's] petition, which mentions [Defendant] once in passing, then fails to state any specific actionable conduct on her part whatsoever, meets even the liberalized requirements that permit notice pleading.").

Moreover, Akerblom fails to articulate how Emas Subsea may be held accountable for the numerous alleged wrongful actions of Lee and/or Ezra. Indeed, in his Original Petition, he gives no indication that the defendants share a relationship that would allow for derivative liability.

## IV. CONCLUSION

When looking only to the causes of action and theories Akerblom pleaded in his Original Petition, as this Court is required to do, Defendants have met their burden of demonstrating that Emas Subsea, the only non-diverse defendant, was improperly joined in this matter. Accordingly, Akerblom's Motion to Remand must be **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 19th day of July, 2011.

*[signature]*

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE